IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HEARST STATIONS INC., d/b/a WCVB-TV,

        Plaintiff,

v.

AEREO, INC.,

        Defendant.

C.A. No. 1:13-cv-11649

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   STATEMENT OF FACTS .......................................................................................... 2

      A.    WCVB........................................................................................................... 2

      B.    Aereo............................................................................................................. 5

III.  ARGUMENT ............................................................................................................... 6

      A.    Standard for Granting Preliminary Injunction ..................................... 6

      B.    WCVB is Likely to Succeed on the Merits of its Claims ...................... 6

            1.    Aereo Violates WCVB's Exclusive Right of Public
                  Performance ....................................................................................... 7

                  a.    Aereo's Conduct Constitutes a Clear Case of
                        Unauthorized Public Performance ................................. 7

                  b.    Aereo's Claim that its Transmissions Are
                        Private is Misplaced ......................................................... 9

            2.    Aereo Violates WCVB's Exclusive Rights to
                  Reproduce and Distribute Its Works........................................... 12

            3.    Aereo Violates WCVB's Exclusive Right to Prepare
                  Derivative Works .............................................................................. 14

      C.    WCVB Will Suffer Irreparable Injury in the Absence of
            Immediate Injunctive Relief .................................................................... 15

      D.    The Balance of Equities Weighs Heavily in WCVB's Favor
            and an Injunction is in the Public Interest............................................. 19

IV.   CONCLUSION............................................................................................................ 20

# TABLE OF AUTHORITIES

Page(s)

CASES

...

# TABLE OF AUTHORITIES

Page(s)

CASES

*American Broadcasting Cos., Inc. v. Aereo*, Inc.,
874 F. Supp. 2d 373 (S.D.N.Y. 2012)........................................................5, 9, 15, 19

*Broadcast Music, Inc. v. Rockingham Venture*, *Inc.*,
909 F. Supp. 38 (D.N.H. 1995)........................................................................8, 9

*Butamax Advanced Biofuels LLC v. Gevo, Inc.*,
868 F. Supp. 2d 359 (D. Del. 2012)......................................................................17

*Cambridge Literary Properties., Ltd. v. W. Goebel Porzellanfabrik*
*G.m.b.H. & Co. KG.*,
510 F.3d 77 (1st Cir. 2007)................................................................................15

*Capitol Records, LLC v. Bluebeat, Inc.*,
765 F. Supp. 2d 1198 (C.D. Cal. 2010) ...............................................................13

*Cartoon Network, LLP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008)..................................................................................9

*CBS Broad., Inc. v. FilmOn.com*,
No. 10-cv-07532-NRB, Dkt. No. 8 (S.D.N.Y. Nov. 22, 2010) .............................15

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006)............................................................................................15

*Fortnightly Corp. v. United Artist Television, Inc.*,
392 U.S. 390 (1968)............................................................................................11

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
No. CV 12–6921, 2012 WL 6784498 (C.D. Cal. 2012) .............................10, 15, 18

*Infinity Broadcasting Corp. v. Kirkwood*,
63 F. Supp. 2d 420 (S.D.N.Y, 1999).....................................................................12

*Jalbert v. Grautski*,
554 F. Supp. 2d 57 (D. Mass. 2008) ...................................................................7, 14

*Lumex, Inc. v. Highsmith*,
919 F. Supp. 624 (E.D.N.Y. 1996) .......................................................................17

*Merrill v. County Stores, Inc.*,
669 F. Supp. 1164 (D.N.H. 1987).........................................................................12

ii

*National Football League v. Insight Telecommunications Corp.*,
    158 F. Supp. 2d 124 (D. Mass. 2001) ....................................................................10

*New Boston Television, Inc. v. Entertainment Sports Programming
    Network, Inc.*,
    No. 81-1010-Z, 1981 WL 1374 (D. Mass. Aug. 3, 1981) ..........................................15, 17, 19

*On Command Video Corp. v. Columbia Pictures Indus.*,
    777 F. Supp. 787 (N.D. Cal. 1991) ......................................................................11

*Ross-Simons of Warwick v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996)..............................................................................15

*Society of Holy Transfiguration Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012)...............................................................................6

*Twentieth Century Fox Film Corp. v. iCraveTV*,
    Nos. 00-121 & 00-120, 2000 WL 255989 (W.D. Pa. Feb. 8, 2000).......................................15

*Voice of the Arab World, Inc. v. MDTV Medidcal News Now, Inc.*,
    645 F.3d 26 (1st Cir. 2011)..............................................................................6, 15

*Warner Bros. Entertainment, Inc. v. WTV Sys., Inc.*
    ("*Zediva*"), 824 F. Supp. 2d 1003 (C.D. Cal. 2011) ................................................ passim

*WNET v. Aereo, Inc.*,
    712 F.3d 676 (2d Cir. 2013)............................................................................2, 9, 10

*Yankee Candle Co., Inc. v. New England Candle Co., Inc.*,
    14 F. Supp. 2d 154 (D. Mass. 1998) .......................................................................7

## STATUTES

17 U.S.C. § 101 .................................................................................... passim

17 U.S.C. § 106..............................................................................7, 8, 9, 10, 12, 13, 14

17 U.S.C. § 110(5)(A) & (B) ...........................................................................12

47 U.S.C. § 2.106 ......................................................................................2

47 U.S.C. § 301.......................................................................................2

47 U.S.C. § 307......................................................................................2, 9

## OTHER AUTHORITIES

47 C.F.R. § 11.11 .....................................................................................3

47 C.F.R. § 11.15 .................................................................................................................3

47 C.F.R. § 73.1740(c)..........................................................................................................2

47 C.F.R. § 73.624(b) .......................................................................................................2, 4

47 C.F.R. § 73.644 ...............................................................................................................4

47 C.F.R. § 79.1 ...................................................................................................................3

H.R. REP. NO. 94-1476 (1976)........................................................8, 9, 11, 12, 13, 14

S. REP. NO. 102-92 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1133 ...............................19

## I.   __INTRODUCTION__

The Copyright Act requires that copyright holders be fairly compensated for the use of their copyrighted work.  Free-riders — those who commercially benefit from another's copyrighted work without compensating the holder of the copyright — undermine this simple but critical concept.  In addition, those same free-riders threaten Congress' carefully constructed regulatory scheme, one that is designed to promote the public interest by assuring a free, over-the-air television broadcast service while protecting copyrights held by local television stations in their programming.  The defendant, Aereo, Inc. ("Aereo"), is one such free-rider.

The plaintiff, Hearst Stations Inc., operates the local television station WCVB-TV ("WCVB").  WCVB has broadcast locally over the air on Channel 5 (or its digital equivalent) since 1972.  Since that time, it has earned a national reputation for the quality of its original local programming.  In addition to its award-winning newscasts, WCVB produces highly-valued local programs, such as *Chronicle, On the Record* and *CityLine*.

Aereo, in contrast, makes nothing.  Its core business model is premised on the unauthorized interception and retransmission of over-the-air broadcasts for a profit.  It does so through the use of vast antenna farms, which are used to intercept WCVB's transmissions.  Aereo then alters the intercepted content into a format suitable for the internet, creates and stores copies of that altered content on its servers, and makes the copies available to paying customers through a subscription service.

Aereo's business is premised on a simple concept:  charge its subscribers a fee for transmitting television programming while paying copyright holders nothing.  As Aereo previously explained, "[b]roadcasters received a license to broadcast in exchange for the obligation to make over-the-air broadcasts available to the public."  Declaration of Courtney Batliner ("Batliner Decl.") filed contemporaneously herewith at Ex. 1(Excerpt of Aereo's Mem.

of Law in Opp'n to Pl.'s Mot. for Prelim. Inj. on Copyright at 1 (May 29, 2012), in *ABC v. Aereo, Inc.*, 12-CV-1540, and *WNET v. Aereo, Inc.*, 12-CV-1543, S.D.N.Y (hereinafter collectively referred to as "*Aereo New York*"). Aereo's business exploits this obligation to the public, taking broadcast signals intended for public consumption and converting those signals into a commercial enterprise — all without paying WCVB for that copyrighted content. Aereo's clear copyright violations put WCVB's entire business model at risk, and undermine a regulatory regime carefully constructed by Congress. As such, this Court should enjoin Aereo's illegal conduct.

## II.    STATEMENT OF FACTS

### A.    WCVB

In 1972, WCVB began broadcasting television programming under a license granted by the Federal Communications Commission ("FCC"). *See* Declaration of Bill Fine ("Fine Decl."), filed contemporaneously herewith at ¶ 5; 47 U.S.C. § 307. At that time, the federal government also allocated WCVB spectrum over the airwaves.[1] *See* Fine Decl. ¶ 5; 47 U.S.C. §§ 301, 307. It is these over-the-air transmissions, intended for the general public, that Aereo intercepts and retransmits for a fee. *See* 47 U.S.C. § 307.

While WCVB is a commercial, for-profit enterprise, it also has responsibilities to the public. *See* Fine Decl. ¶ 11. For instance, WCVB is required to broadcast its programming over the air, even as the industry has moved toward cable and other media for the distribution of programming.[2] *See* 47 C.F.R. §§ 73.624(b), 73.1740(c); Fine Decl. ¶ 11. In addition, the FCC

---

[1] As a limited resource, the federal government controls spectrum and allocates it among broadcasters, telecom providers, the military, first responders and satellite users. *See* 47 U.S.C. §§ 2.106, 301.

[2] According to Aereo, approximately 54 million Americans still receive their programming through over-the-air broadcasts. *See* Batliner Decl., Ex. 2 (Aereo Blog, *People Have Enjoyed the Right to Access Over-the-air Broadcast Television,* Apr. 16, 2013).

requires television broadcasters like WCVB to provide certain mandatory content, such as closed captioning, video descriptions, an Emergency Alert System and access to emergency information.  *See* 47 C.F.R. §§ 11.11, 11.15, 79.1; Fine Decl. ¶ 11.

Over the forty years of its existence, WCVB has become a leader in the Boston television market and has, on multiple occasions, received some of the industry's highest honors.  *See* Fine Decl. ¶ 9.  WCVB's valuable local programming includes shows such as *Chronicle*, a unique, locally-produced, weekday magazine show; *CityLine*, an award-winning urban news and feature weekly magazine; and *On The Record*, a weekly political roundtable featuring discussions with local Massachusetts newsmakers.  *See id.* at ¶ 8.  Most recently, WCVB provided, at extraordinary expense, around-the-clock and virtually commercial-free news coverage in the wake of the Boston Marathon bombings.  *See id.* at ¶ 7.  In total, WCVB creates, produces, broadcasts and distributes over 43 hours per week of original, local programming, including local news, weather, emergency information, sports, entertainment and health and wellness programs.[3]  *See id.*

As a result of its efforts, WCVB recently received more awards than any other commercial media outlet in New England.  *See id.* at ¶ 10.  Its honors include twelve Local Emmy Awards in 2012 and ten regional Associated Press Awards, including "News Station of the Year."  *See id.* WCVB also has received the 2012 National Edward R. Murrow Award for Overall Excellence in the Television Large Market category, which is awarded to a news organization that exemplifies "the absolute highest standards in serving its audience through quality electronic or digital journalism," multiple recognitions as Television Station of the Year by the national Gabriel Awards, the National Headliner Award, the Walter Cronkite Award for

---

[3] In addition, WCVB also pays for the right to transmit network and syndicated programming produced by others, which it also broadcasts over the air.  *See* Fine Decl. ¶ 13.

Excellence in Political Journalism, the Alfred I. DuPont-Columbia University Award and the George Foster Peabody Award. *See id.* at ¶ 10 and Ex. 7 (www.rtdna.org, *RTDNA Announces 2012 National Edward R. Murrow Award Winners* (Nov. 13, 2012)).

WCVB expends considerable amounts of money, time, energy and creativity in producing its original programming and in building the substantial broadcasting infrastructure necessary to transmit and distribute its works. *See id.* at ¶¶ 12, 14. To date, WCVB transmits its programming primarily in two ways. One, it broadcasts over the air, as it is required to do by federal regulation. *See id.* at ¶ 15; 47 C.F.R. §§ 73.624(b), 73.644. Two, it contracts with cable, satellite and other telecommunications companies. *See* Fine Decl. ¶ 15. WCVB is compensated for its works through commercial advertising revenue and from the fees paid by cable, satellite and other telecommunications companies for the right to retransmit and resell WCVB's signal, which contains its highly-valued programming. *See id.* at ¶ 17.

WCVB also is actively involved in developing new ways to transmit its programming over the internet. *See id.* at ¶ 24. For broadcasters like WCVB, internet streaming[4] involves discussions, negotiations and agreements between and among various stakeholders, such as copyright holders of syndicated shows like *The Ellen DeGeneres Show* and *Inside Edition*, and the cable, satellite and other telecommunications companies who presently transmit WCVB's programming with authorization. *See id.* at ¶¶ 24, 27, 28. Before WCVB can fully stream its daily programming, it must ensure that it is operating within all parties' rights and obligations, a process made substantially more complicated by Aereo's unauthorized internet transmissions. *See id.* at ¶¶ 22-28.

---

[4] "Streaming" is the process of giving an end user access, over the internet, to a copy that resides on a remote server — as Aereo purports to do. By contrast, "downloading" results in an electronic file embodying the copyrighted work being created on and (potentially) saved to the end user's own internet-capable device.

**B.**     **Aereo**[5]

On or about May 30, 2013, Aereo made its service available to the public in the Boston television market.[6]  *See* Batliner Decl., Ex. 3 (Aereo Blog, *Aereo in Boston*, Apr. 24, 2013). Aereo offers and advertises its "Boston" service to residents in parts of Massachusetts, New Hampshire and Vermont.  *See* Batliner Decl., Ex. 7 (Screenshot of Aereo website, *Coverage Area, Boston*).

When subscribers log on to Aereo, they are offered two options:  either "Watch" or "Record" a program airing on a covered network.  *See* Batliner Decl., Ex. 8 (Decl. of Joseph Lipowski submitted in *Aereo New York*) at ¶ 6.  To divert a program into its service, Aereo uses elaborate antenna farms, which intercept broadcast signals intended for use by the general consuming public.  *See* Batliner Decl., Ex. 9 (Excerpt of Expert Report of Paul Horowitz submitted in *Aereo New York* at p.22, Fig. 10).  Aereo then routes these intercepted signals through its processors, altering their format to make the signals internet-compatible.  *See* Batliner Decl., Ex. 8 at ¶ 41.  Aereo next makes three separate copies of a requested program at varying quality levels, which Aereo stores on its hard-drives.  *See id.* at ¶ 42; Batliner Decl., Ex. 6 (*Aereo New York* Prelim. Inj. Hr'g Tr., May 30, 2012) at 135:21–136:7.  Finally, Aereo unlawfully retransmits the programming over the internet to its subscribers' devices from these copies.  *See* Batliner Decl., Ex.8 at ¶ 51.  The copies that Aereo creates are stored in their entirety on Aereo's hard drives at least until WCVB's broadcast of the relevant programming has ended and, if

---

[5] The facts set forth in this section are based solely upon statements made by Aereo.  WCVB accepts those statements as true only for purposes of these papers.

[6] On or about May 15, 2013, Aereo had launched a subscription-based online "Pay-TV" business in the Boston television market, which at that time allowed consumers who had pre-registered for the service to begin using Aereo to watch "live" and/or record WCVB's broadcast television programming.  *See* Batliner Decl., Exs. 3 (Screenshot of Aereo Blog, *Aereo in Boston*, Apr. 24, 2013), 4 (Screenshot of Aereo's Website, *About Aereo*), 5 (Screenshot of Aereo's website, *Available Boston Channels*); and 6 (*Aereo New York* Prelim. Inj. Hr'g Tr., May 30, 2012) at 183:7–18.  However, Aereo did not go fully online until May 30, 2013.

"recorded," remain until the subscriber deletes the program or runs out of allocated space.  *See id.* at ¶¶ 6 n.1, 42.  In this way, Aereo's service enables subscribers to view a local broadcast signal from locations where they could not pick up that signal using a home antenna.  *See* Batliner Decl., Ex. 6 at 331:13–22.

Aereo uses WCVB's intercepted programming for commercial gain, charging each subscriber a monthly payment for its service.  *See* Batliner Decl., Ex. 10 (Screenshot of Aereo Website, *Frequently Asked Questions*).[7]  By intercepting WCVB's over-the-air signals in this way, Aereo avoids compensating WCVB (and other local copyright holders).  As Aereo acknowledges, its "business model" potentially extends beyond itself, to the cable, satellite and other telecommunications companies themselves, which also would find it attractive to avoid paying fees to copyright holders like WCVB.  *See* Batliner Decl., Ex. 6 at 216:7–217:14.

## III.   ARGUMENT

### A.   Standard for Granting Preliminary Injunction

"[A] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted).

### B.   WCVB is Likely to Succeed on the Merits of its Claims

To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 39 (1st Cir. 2012).  In this context,

---

[7] Aereo also intends to use WCVB's broadcasts indirectly to sell subscribers related services.  *See* Batliner Decl., Ex. 6 at 185:13–186:24, 214:15–24.

"'[c]opying is a shorthand [for] infringing any of the copyright owner's five exclusive rights set forth at [Section 106 of the Copyright Act] . . . .'" *Jalbert v. Grautski*, 554 F. Supp. 2d 57, 67 (D. Mass. 2008) (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991)).  Those exclusive rights include the right to control the public performance, reproduction, distribution and derivative works of the copyrighted work.  *See* 17 U.S.C. § 106.

WCVB has applied for registration of or has notified Aereo that it intends to register copyrights for local programming that Aereo unlawfully alters, copies, transmits and distributes. *See* Fine Decl. ¶ 6 and Exs. 2-5 (documentation of WCVB's copyright registrations) and 6 (notice to Aereo of intent to copyright additional works).[8]  Aereo's service infringes those copyrights because it infringes upon WCVB's exclusive rights to publicly perform, reproduce, distribute and prepare derivative works of its copyrighted works.

### 1.      Aereo Violates WCVB's Exclusive Right of Public Performance

#### a.      Aereo's Conduct Constitutes a Clear Case of Unauthorized Public Performance

The Copyright Act gives a copyright holder the exclusive right to "perform [its] copyrighted work publicly."  *See* 17 U.S.C. § 106(4).  In conveying this right, the Copyright Act defines public performance broadly.  To "perform" an audiovisual work requires only that one "show its images in any sequence or . . . make the sounds accompanying it audible."  17 U.S.C. § 101.  A "public" performance, meanwhile, can take many forms, broadly including the "***transmit*[ting** of a performance] . . . *by means of any device or process*, whether the members of the public capable of receiving the performance . . . receive it in the same place or

---

[8] "The Copyright Office, after accepting an application, fee, and deposit of a representative copy of the work, . . . issues a certificate of registration, which is admissible in an infringement action as 'prima facie evidence of the validity of the copyright and of the facts stated in the certificate.'"  *Yankee Candle Co., Inc. v. New England Candle Co., Inc.*, 14 F. Supp. 2d 154, 157 (D. Mass. 1998) *vacated pursuant to settlement by* 29 F. Supp. 2d 44 (D. Mass. 1998) (citing 17 U.S.C. § 410(c) and noting that the Court allowed plaintiff's claim while application was pending).

*in separate places* and at the same time or *at different times*." *Id.* (emphases added).

"Transmit" also is broadly defined: "[t]o 'transmit' a performance or display is to communicate it by *any device or process* whereby images or sounds are received *beyond the place from which they are sent*." *Id.* (emphasis added). Thus, a performance is public if it involves "sending out some sort of signal via a device or process to be received by the public at a place beyond the place from which it is sent." *See Broad. Music, Inc. v. Rockingham Venture*, 909 F. Supp. 38, 45 (D. N.H. 1995).

"Device" or "process," finally, explicitly encompasses technologies "*now known or later developed*." 17 U.S.C. § 101 (emphasis added).[9] The legislative history of the Copyright Act confirms that Congress intended its protections to encompass all future technologies that potentially could be used to transmit copyrighted audiovisual works:

> The definition of "transmit" . . . is *broad enough to include all conceivable forms and combinations of wires and wireless communications media*, including but by no means limited to radio and television broadcasting as we know them. Each and every method by which the images and sounds comprising a performance . . . are picked up and conveyed is a "transmission," and *if the transmission reaches the public in [any] form the case comes within the scope of . . . section 106*.

H.R. REP. NO. 94-1476, at 64 (1976) (emphasis added).

Congress also made clear that the strictures of Section 106 are intended to apply to commercial enterprises such as Aereo. As stated in the legislative history, "commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material" must pay "copyright royalties to the creators of such programs." *Id.* at 88–90. Aereo is such a commercial enterprise.

---

[9] As one court has stated, the technical details of a given device or process are irrelevant to a "public performance" analysis. *See, e.g., Warner Bros. Entm't, Inc. v. WTV Sys., Inc.* ("*Zediva*"), 824 F. Supp. 2d 1003, 1010 (C.D. Cal. 2011) (in granting summary judgment, court concluded that providing customers with online access to "rental DVDs" was public performance).

Indeed, based on Aereo's own description of its service, it unquestionably publicly performs WCVB's copyrighted work for a fee. Aereo's core business model is premised on the unauthorized interception and transmission of WCVB's copyrighted works, which Aereo then makes available to the public for a monthly subscription fee. Aereo begins by intercepting copyrighted programs intended for the general consuming public *See* 47 U.S.C. § 307. Aereo then sells that same copyrighted programming by streaming it over the internet to its subscribers. *See* Batliner Decl., Ex. 10. By so doing, Aereo uses a "device or process" to "show . . . images in . . . [a] sequence [and] to make sounds accompanying it audible," and those transmissions are "received by the public at a place beyond the place from which [the transmission] was sent." *See* 17 U.S.C. § 101. Aereo does so without authorization or license. As such, Aereo publicly performs WCVB's copyrighted work in clear violation of WCVB's exclusive rights under Section 106(4) of the Copyright Act. *See* 17 U.S.C. § 101; H.R. REP NO. 94-1476, at 88–90; *Broad. Music, Inc.*, 909 F. Supp. at 45.

        **b.**    **Aereo's Claim that its Transmissions Are Private is Misplaced**

In prior litigation, Aereo has not denied that it transmits, without permission, the copyrighted materials of others. Rather, Aereo argues that, despite offering its services to the public-at-large, its transmissions actually are private in nature. Specifically, Aereo claims that each antenna in its antenna farm transmits to only a single subscriber at any given time, and that each transmission is associated with only a single copy of the underlying copyrighted work. *See ABC, Inc. v. Aereo*, 874 F. Supp. 2d 373, 385 (S.D.N.Y. 2012). In this way, Aereo has argued that its service is no different from an individual consumer's use of his or her own home antenna.[10]

---

[10] Aereo presented these arguments in *WNET v. Aereo, Inc.*, 712 F.3d 676 (2d Cir. 2013). Over a strongly-worded dissent, that panel felt constrained by prior precedent unique to that circuit, *Cartoon Network, LLP v. CSC Holdings,*

Aereo's arguments are misplaced for at least two reasons.  First, the statute "does not . . . require that two members of the public receive the performance *from the same transmission*" to establish a public performance.  *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC,* No. CV 12–6921, 2012 WL 6784498, at *4 (C.D. Cal. 2012) (emphasis added) (granting preliminary injunction against service provider using substantially same technology and business model as Aereo).  The statute is concerned with "the performance of the copyrighted *work* [*i.e.*, WCVB's programming], irrespective of which copy of the work the transmission is made from." *Id.* (emphasis in original).  Indeed, Congress expressly contemplated that performances are public even if seen at different times, in different places, and on different devices.  *See* 17 U.S.C. §106(4).  Whether subscribers see separate copies of the same work is simply irrelevant to the analysis.  *See WNET v. Aereo, Inc.*, 712 F.3d 676, 701 (2d Cir. 2013) (Chin, J., dissenting) ("While Congress in 1976 might not have envisioned the precise technological innovations employed by Aereo today, th[e] legislative history surely suggests that Congress could not have intended for such a system to fall outside the definition of a public performance.'"); *Nat'l Football League v. Insight Telecomm. Corp.*, 158 F. Supp. 2d 124, 132 n.10 (D. Mass. 2001) ("[T]he Copyright Act should be construed with an understanding of changing technologies" and "interpretation of the Copyright Act must occur in the real world of telecommunications, not in a vacuum.").  Aereo's subscribers are all seeing the same copyrighted work.  Undoubtedly, these retransmissions are public.  *See BarryDriller,* 2012 WL 6784498, at *4.

Second, Aereo's claim that its system is comparable to an individual consumer's use of his or her own antenna has been rejected by Congress.  That logic was the basis of the Supreme

---

*Inc.*, 536 F.3d 121 (2d Cir. 2008).  That precedent is not binding on this Court, however, and the petition seeking review on banc is still pending.  In contrast to *WNET*, in *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, No. CV 12–6921, 2012 WL 6784498 (C.D. Cal. 2012), where the Central District of California (like this Court) was not bound by *Cablevision*, that court summarily rejected a virtually identical argument presented by Aereo's competitor.

Court's decision in *Fortnightly Corp. v. United Artist Television, Inc.*, 392 U.S. 390 (1968). *See* 392 U.S. at 399 (holding that community antenna did not publicly perform within the meaning of Copyright Act of 1909, as worded at that time, because it did "no more than enhance[ ] the viewer's capacity to receive the broadcaster's signal"). Congress expressly addressed that decision when it revised the Copyright Act in 1976. *See* H.R. REP. NO. 94-1476, at 88–90 (explaining that *Fortnightly* "urged the Congress . . . to consider and determine the scope and extent" of copyright liability for "commercial subscription services that pick up broadcasts of programs originated by others and retransmit them to paying subscribers"). In the 1976 Copyright Act, Congress expressly made clear that "*commercial enterprises* whose basic retransmission operations are based on the carriage of copyrighted program material" must obtain authorization and pay "copyright royalties . . . to the creators of such programs." *Id*. at 89 (emphasis added). *See also Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1010 (C.D. Cal. 2011) (hereinafter, "*Zediva*") ("Defendants' transmissions are 'to the public' because the relationship between Defendants as the transmitter of the performance, and the audience, which in this case consists of their customers, is a commercial, 'public' relationship regardless of where the viewing takes place."); *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787, 790 (N.D. Cal. 1991) (citing cases from other jurisdictions and H.R. REP. NO. 94-1476 for the same proposition).

In fact, in Section 110(5) of the Copyright Act, Congress expressly anticipated the very argument that Aereo now puts forth, *i.e.*, that it merely offers an enhanced version of an individual consumer's home antenna. While that section does indeed protect private use, as Aereo implies, that protection does not apply:  (a) if there is a ***charge*** for seeing the transmission, or (b) when the retransmission extends beyond the place where the enhanced home antenna is

located.  *See* 17 U.S.C. § 110(5)(A) & (B) (carving out exception for home antennas "*unless* a direct charge is made to see or hear the transmission" or "the transmission thus received is further transmitted to the public") (emphasis added).  Because Aereo charges for its service, *see* Batliner Decl., Ex. 10, and retransmits over the internet, *see id.* at Ex. 6 at 185:13–186:24, 214:15–24, its analogy to private, home use is therefore unavailing.  *See* H.R. REP. NO. 94-1476, at 87 (public communication "by means other than a home receiving set, or further transmission of a broadcast to the public, is considered an infringing act"); *Infinity Broad. Corp. v. Kirkwood*, 63 F. Supp. 2d 420, 426 (S.D.N.Y, 1999) (referring to analogous Section 111, court held that "[to allow] a commercial enterprise based on the carriage of copyrighted materials [over the internet] . . . would do violence to a fundamental premise of the 1976 revision"); *Merrill v. County Stores, Inc.*, 669 F. Supp. 1164, 1170–71 (D.N.H. 1987) (holding owners of store liable for copyright infringement by public performance where their in-store intercommunication system, capable of broadcasting radio station programs throughout the store, "indirectly increase[d] and enhance[d] sales").[11]

### 2.  Aereo Violates WCVB's Exclusive Rights to Reproduce and Distribute Its Works

Copyright holders enjoy the exclusive right "to reproduce the copyrighted work in copies" and to authorize others to do the same.  17 U.S.C. § 106(1).  A work is "reproduced" when the copy is fixed in a tangible form "from which it can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device," and such

---

[11] In addition, there is no doubt that Aereo provides far more than a viewer could obtain using a home antenna, as evidenced by the fact that Aereo:  (a) makes not one, but *three* copies of a program when a subscriber merely asks to watch the program "live"; and (b) makes local television broadcasts available for viewing in locations far beyond the area where they could be picked up by a home antenna.  *See* Batliner Decl., Ex. 6 at 135:21–136:7, 331:13–22.  *See also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 282 (2d. Cir. 2012) ("Internet retransmission services are not seeking to address issue of reception and remote access to over-the-air television signals.  They provide not a local but a nationwide (arguably international) service.")

fixation is "sufficiently permanent or stable to permit it to be perceived, reproduced or otherwise communicated for a period of more than transitory duration."  H.R. REP. NO. 94-1476, at 62; *see also* 17 U.S.C. § 101 (defining "copies" and "fixed").

Aereo creates three unauthorized copies of WCVB's copyrighted programming each time it stores a WCVB program (or portion thereof) to its hard drive.  *See* Batliner Decl., Ex. 6 at 135:21–136:7.  These copies can be and are perceived by Aereo's subscribers through their internet-enabled devices.  These copies also are saved for a period of more than a transitory duration — regardless of whether Aereo's subscribers are using its "Watch" or "Record" feature. As Aereo explains, it creates "a true, fixed recording . . . ; it is not a 'buffer' that is ephemeral or overwritten by later content as it records."  Batliner Decl., Ex. 8 at ¶ 53.  *See also id.* at ¶ 6 n.1 ("[I]n the 'record' mode the recording is saved until the user chooses to delete it or that user's [allocated memory on Aereo's hard drive] runs out of space.").  As such, it can hardly be disputed that Aereo creates unauthorized copies of WCVB's programming in violation of Section 106(1).

Copyright holders also have the exclusive right to distribute copies of their works to the public.  *See* 17 U.S.C. § 106(3).  While the statute does not define "distribute . . . to the public," courts have recognized that Section 106(3) applies to conduct such as Aereo's.  First, streaming content over the internet constitutes distribution within the meaning of Section 106.  *See, e.g., Capitol Records, LLC v. Bluebeat, Inc*., 765 F. Supp. 2d 1198, 1203 (C.D. Cal. 2010) ("[Defendant] *distributed* and publicly performed the Copyrighted Recordings [when it] transmitted its audio visual works either as downloads *or streams*.") (emphasis added); *Zediva*, 824 F. Supp. 2d at 1005 (listing streaming content among the "variety of ways" in which defendant "*distributed to [the public]* and publicly performed" plaintiffs' audiovisual works).

Second, "public" is defined broadly.  "[E]ven one person can be the public for the purposes of [S]ection 106(3)." *Jalbert*, 554 F. Supp. 2d at 68 n. 14 (citing *Ford Motor Co.*, 930 F.2d at 299–300 ("[a] violation of [S]ection 106(3) can also occur when illicit copies of a copyrighted work are only distributed to one person.").

Aereo not only creates unauthorized copies of WCVB's works in violation of Section 106(1), it also distributes those copies to the public in violation of Section 106(3) whenever it makes WCVB programming available to an internet user. *See* H.R. REP. NO. 94-1476, at 62.  As such, Aereo has violated these provisions as well.

### 3.    Aereo Violates WCVB's Exclusive Right to Prepare Derivative Works

Section 106(2) provides copyright holders with the exclusive right to "prepare derivative works based upon [their] copyrighted work." 17 U.S.C. § 106(2).  The Copyright Act defines a derivative work as "a work based upon one or more preexisting works, such as a translation, . . . abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted . . . ." 17 U.S.C. § 101.

Aereo creates an unauthorized derivative work whenever it technologically alters and compresses one of WCVB's television programs from its original digital broadcast format into a different digital format that is suitable for the internet.  As Aereo explains, after receiving a broadcast signal, Aereo sends that signal to a "transcoder [that] re-formats and compresses the information so that it is more easily recorded and is more compatible with the [subscriber's] ability to pull the stream through the Internet . . . .  Once transcoded, the signal is recorded to a hard drive [from which it] may be later retrieved and played back." Batliner Decl., Ex. 8 at ¶¶ 41–42.  This modification and compression is particularly important here because it degrades the quality of the work and can result in the loss of critical content. *See* Batliner Decl., Ex. 11 (Screenshot of Aereo's Website, *Support Center*); Fine Decl. ¶ 16.  Because Aereo's alteration,

modification and compression of WCVB's signal "translates" the copyrighted work from one

digital language to another, the resulting version of the copyrighted work is a translation, which

constitutes an unauthorized derivative work. *See, e.g., Cambridge Literary Props., Ltd. v. W.*

*Goebel Porzellanfabrik G.m.b.H. & Co. KG.*, 510 F.3d 77, 90 n.11 (1st Cir. 2007) ("As a

translation, The Hummel Book itself is a derivative work . . . .").

### C.   WCVB Will Suffer Irreparable Injury in the Absence of Immediate Injunctive Relief

Aereo's unauthorized use of WCVB's copyrighted programming has caused and, unless

enjoined, will continue to cause WCVB irreparable injury.  Irreparable injury is "a substantial

injury that is not accurately measurable or adequately compensable by money damages." *Ross-*

*Simons of Warwick v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).  Examples of irreparable

injuries include loss of incalculable revenue and harm to goodwill or reputation. *See id.*

Significantly, every case that has addressed the question of whether irreparable harm

results from the unauthorized retransmission of copyrighted television broadcasts over the

internet has concluded unequivocally that it does.[12] *See, e.g., BarryDriller*, 2012 WL 6784498,

at * 6; *Aereo*, 874 F. Supp. 2d at 396-400; *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 617–20

(S.D.N.Y. 2011), *aff'd*, 691 F.3d 275, 285–87 (2d. Cir. 2012); *CBS Broad., Inc. v. FilmOn.com*,

No. 10-cv-07532-NRB, Dkt. No. 8 (S.D.N.Y. Nov. 22, 2010); *Twentieth Century Fox Film Corp.*

*v. iCraveTV*, Nos. 00-121 & 00-120, 2000 WL 255989, at *8 (W.D. Pa. Feb. 8, 2000); *accord*

*Zediva*, 824 F. Supp. 2d at 1012–14.  As the Second Circuit explained in *ivi,* the unauthorized

---

[12] Moreover, "'a copyright holder in the ordinary case may be presumed to suffer irreparable harm when his right to the exclusive use of the copyrighted material is invaded.'" *New Boston Television, Inc. v. Entm't Sports Programming Network, Inc.*, No. 81-1010-Z, 1981 WL 1374, at *3 (D. Mass. Aug. 3, 1981) (internal citations omitted).  The First Circuit has declined to decide whether this presumption of irreparable harm has been overruled by the Supreme Court's ruling in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 1265 Ct. 1834, 1841 (2006).  *See Voice of The Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 34 (1st Cir. 2011).  In any event, as discussed herein, irreparable harm is demonstrably clear in this instance.

distribution and retransmission of copyrighted television programming threatens to destabilize

the free, over-the air television broadcast industry:

> The absence of a preliminary injunction would encourage current and prospective retransmission rights holders, as well as other Internet services, to follow ivi's lead in retransmitting plaintiffs' copyrighted programming without their consent. The strength of plaintiffs' negotiating platform and business model would decline. The quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules — all would be adversely affected.  These harms would extend to other copyright holders of television programming.  Continued live retransmission of copyrighted television programming over the Internet without consent would thus threaten to destabilize the entire industry.

*ivi*, 691 F.3d at 286.

WCVB suffers a substantial risk of incurring these same harms.  Specifically, by its own

free-riding conduct and by incentivizing others to replicate its conduct, Aereo directly threatens

new sources of revenue for WCVB resulting from online streaming, as well as two historic

sources of revenue that have enabled broadcasters like WCVB to continue producing original,

local programming: retransmission fees and advertising fees.  *See* Fine Decl. ¶¶ 17–35.  First,

Aereo's conduct irreparably harms WCVB in connection with the promising new revenue source

of internet streaming.  *See id.* at ¶ 22.  Except in isolated circumstances, such as its own coverage

of a breaking news event, WCVB must work with its business partners when transmitting (either

itself or by authorization) its programming over the internet.  *See id.* at ¶¶ 22–24.  WCVB must,

for instance, consider the distribution rights of third-party copyright holders, such as the holders

for syndicated shows like *The Ellen DeGeneres Show* and *Inside Edition*.  *See id.* at ¶¶ 13, 23–

24.  It also must work with its current cable, satellite and other telecommunications  operators to,

for instance, provide for safeguards for authenticating viewers.  *See id.* at ¶ 27.  As such, WCVB

must work within a regulatory and contractual scheme, one that Aereo treats as irrelevant to its

core business model.

In fact, if the Court were to sanction Aereo's conduct, it would create the perverse situation where Aereo could profit from streaming WCVB's programming over the internet, while WCVB *itself* could not do so.  *See id.* at ¶¶ 23–25.  If allowed to continue, this situation would deprive WCVB of a significant first-mover advantage in what is considered to be a highly attractive market, due at least in part to the high penetration of broadband in the area.  *See id.* at ¶ 25.  *See also Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 868 F. Supp. 2d 359, 374–75 (D. Del. 2012) (rejecting defendant's "claims that it will not jeopardize plaintiff's first mover advantage," and finding "that irreparable harm would exist assuming defendant were infringing"); *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 630 (E.D.N.Y. 1996) (finding that disclosure of plaintiff's trade secrets would "retard its goal of being 'first to the market' with its new product," and that irreparable harm results).  Indeed, as the primary internet source for WCVB programming in the market, Aereo would have the opportunity to fashion new and profitable advertising schemes not now available to WCVB itself, such as advertisements targeted to specific internet users and advertising displays on banners.  *See* Fine Decl. ¶ 26.  To allow such a result would create harm that is inherently difficult to measure and cannot be remedied with money damages.  *See New Boston Television*, 1981 WL 1374, at *3 (finding that even where plaintiffs had not yet entered a new market, "this does not permit defendants to appropriate plaintiffs' copyrighted material and effectively preclude such efforts in the future[,]" and plaintiffs could not be compensated for their injury by way of monetary damages).

Second, Aereo's actions directly and incalculably impact WCVB's two most historically important sources of revenue:  retransmission fees and advertising fees.  *See* Fine Decl. ¶¶ 29–35.  With regard to the retransmission fees paid by cable, satellite and other telecommunications companies to retransmit WCVB's signal, Aereo can charge its subscribers less than these

companies because it does not pay fees to WCVB and is not required to incur the costs necessary to comply with the quality and other controls that WCVB requires of its contracting partners. *See id.* at ¶ 31.  With a low-price competitor operating outside a regulatory and contractual framework, Aereo's retransmissions will cause at least some of WCVB's licensees' customers to cancel their service, thereby negatively impacting WCVB's negotiation position with those licensees.  *See BarryDriller*, 2012 WL 6784498, at *6; *Zediva*, 824 F. Supp. 2d at 1012–13; Fine Decl. ¶¶ 30–32

Even worse, licensed distributors of WCVB's broadcasts may opt to develop their own Aereo-like systems, rather than pay fees to WCVB.  *See* Fine Decl. ¶ 33; *see also ivi*, 691 F.3d at 286 (explaining that, if not preliminary enjoined, ivi's streaming "of copyrighted television programming over the Internet without consent . . . would encourage current and prospective retransmission rights holders, as well as other Internet services, to follow ivi's lead in retransmitting plaintiffs' copyrighted programming without their consent.  The strength of plaintiffs' negotiating platform and business model would decline.").[13]  Indeed, Aereo's own CEO has acknowledged that Aereo's model is attractive to cable providers because, if permitted, Aereo's approach would enable them to avoid paying fees to WCVB and others for their programming.  *See* Batliner Decl., Ex. 6 at 216:7–217:14.  In any of these scenarios, WCVB will suffer irreparable harm because the loss of revenues it derives from licensing agreements is unquantifiable.  *See ivi*, 692 F.3d at 285–86; *BarryDriller,* 2012 WL 6784498, at *6.

Aereo's unauthorized transmission of WCVB's programming also undermines WCVB's ability to generate advertising revenue.  *See ivi*, 691 F.3d at 285–86 ("Broadcast television

---

[13] The *ivi* court added that "[t]he quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules — all would be adversely affected," and concluded that, absent a preliminary injunction, ivi's "streaming copyrighted works without permission . . . would . . . threaten to destabilize the entire [television] industry." *ivi*, 691 F.3d at 286.

stations and networks earn most of their revenues from advertising."); Fine Decl. ¶¶ 34–35.

Advertising rates are predicated on measurable viewership.  *See ivi,* 691 F.3d at 285–86; Fine

Decl. ¶ 34.  Viewers who watch WCVB's broadcasts using Aereo's service cannot be measured

by WCVB.  *See Aereo*, 874 F. Supp. at 397–98; Fine Decl. ¶ 35.  Further, because WCVB lacks

any business relationship with Aereo, it is not privy to any information Aereo may learn about its

viewers' consumption habits.  *See id.*  Aereo's unauthorized exploitation of WCVB's

programming could result in a material undercounting of WCVB's viewership, which is difficult,

if not impossible, to quantify.  *See id.*  This undercounting adversely affects the amounts

advertisers will pay to WCVB, *see Aereo*, 874 F. Supp. at 398, Fine Decl. *See id.* at ¶ 35, and

constitutes irreparable harm, *see New Boston Television*, 1981 WL 1374, at *3.

    **D.**    **The Balance of Equities Weighs Heavily in WCVB's Favor and an Injunction is in the Public Interest**

Where, as here, Aereo's only harm would be the loss of its illegal business, the balance of

equities weighs heavily in WCVB's favor.  *See ivi*, 765 F. Supp. 2d at 621 ("It is axiomatic that

an infringer of copyright cannot complain about the loss of ability to offer its infringing

product."); *Zediva*, 824 F. Supp. 2d at 1014–15 (concluding that balance of hardships "sharply"

favors plaintiffs because defendants could not complain of harm that would befall them when

properly forced to desist from their infringing activities).

Further, Boston area residents have a strong interest in continuing to receive WCVB's

unique, local programming.  If WCVB's original programming is not protected from free-riders

like Aereo, WCVB will lose the financial resources necessary to produce this expensive

programming.  *See ivi*, 765 F. Supp. 2d. at 621 ("If Plaintiffs lose control over their products or

potential revenue sources, they will lose valuable incentives to continue to create

programming."); S. REP. NO. 102-92, at 42 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1133

(recognizing that "vital local service" provided by broadcasting will be jeopardized if retransmitters are permitted to carry signals without paying programmers).  This interest is particularly high with regard to local news coverage which, in the vast majority of markets, comes almost exclusively from local broadcast stations.  *See* Fine Decl. ¶¶ 33, 36–37.

Finally, it is in the public's interest to ensure that Aereo, like all other distributors of television programming, is required to operate within the carefully-crafted regulatory scheme governing television broadcasting and distribution.  *See* Fine Decl. ¶ 38.  If Aereo is allowed to intercept signals intended for the general public and convert them into a commercial enterprise, it acts outside Congress's carefully constructed statutory scheme and the commercial relationships that enforce requirements that are in the public interest.  In short, as a rogue player, Aereo would be free to act against the public interest in ways that other broadcasters and distributors cannot.  Allowing such a scheme surely is against the public interest.

## IV.  <u>CONCLUSION</u>

WCVB respectfully requests that the Court issue an Order in the form submitted with its motion granting WCVB a preliminary injunction.

Respectfully submitted,

HEARST STATIONS INC.

By its attorneys,

*/s/ James D. Smeallie*
James D. Smeallie (BBO #467380)
Joshua C. Krumholz (BBO #552573)
Brian G. Leary (BBO #548386)
Elizabeth M. Mitchell (BBO #638146)
Holland & Knight LLP
10 St. James Avenue
Dated:  July 9, 2013            Boston, MA 02116

#23736613_v13

20