UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HEARST STATIONS INC., d/b/a WCVB-TV,

Plaintiff,

v.

AEREO, INC.,
Defendant.

C.A. No. 1:13-cv-11649-NMG

**ORAL ARGUMENT REQUESTED
PURSUANT TO L.R. 7.1(d)**

**DEFENDANT AEREO, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO
HEARST STATIONS INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

FACTS ........................................................................................................................ 4

ARGUMENT ............................................................................................................. 6

    I.     HEARST IS NOT LIKELY TO SUCCEED ON ITS COPYRIGHT INFRINGEMENT CLAIMS ................................................................. 6

        A.     Aereo Does Not Infringe Any Public Performance Right Because Its Technology Enables Private, Not Public Performances ........................... 6

        B.     Aereo Does Not Infringe Any Reproduction Right Because The Consumer Makes The Copy .................................................................... 11

        C.     The Aereo Technology Platform Does Not Involve Any "Distribution" . 14

        D.     The Aereo Technology Platform Does Not Involve the Creation of Any "Derivative Works" ...................................................................... 16

    II.    HEARST HAS NOT DEMONSTRATED IRREPARABLE HARM ................. 17

    III.   THE BALANCE OF EQUITIES FAVORS AEREO ........................................ 19

    IV.   AN INJUNCTION IS NOT IN THE PUBLIC INTEREST ............................... 20

CONCLUSION ......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Broad. Cos. v. Aereo, Inc.*,
  874 F. Supp. 2d 373 (S.D.N.Y. 2012) ("*Aereo I*") ........................................................ passim

*Am. Broad. Cos. v. Aereo, Inc.*,
  12-CV-2807, 12-CV-2786, 2013 WL 3657978 (2d Cir. July 16, 2013) ("*Aereo III*")......1, 2, 8

*Bridgeman Art Library v. Corel Corp.*,
  36 F. Supp. 2d 191 (S.D.N.Y. 1999)........................................................................17

*Cambridge Literary Props. v. W. Goeble Porzellanfarbrik G.m.b.H.*,
  510 F. 3d 77 (1st Cir. 2007)..............................................................................17

*Capital Records, LLC v. Bluebeat, Inc.*,
  765 F. Supp. 2d 1198 (C.D. Cal. 2010) ...................................................................15

*Charlesbank Equity Fund II v. Blinds To Go*,
  370 F.3d 151 (1st Cir. 2004)..............................................................................19

*CoStar Group, Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) .............................................................................12

*D&H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co.*,
  640 F.3d 27 (1st Cir. 2011)................................................................................6

*Disney Enter., Inc. v. Hotfile Corp.*,
  798 F. Supp. 2d 1303 (S.D. Fla. 2011) ..................................................................15

*Field v. Google Inc.*,
  412 F. Supp. 2d 1106 (D. Nev. 2006)....................................................................15

*Fortnightly Corp. v. United Artists Television, Inc.*,
  392 U.S. 390 (1968)........................................................................................10

*Fox Broad. Co. v. Dish Network L.L.C.*,
  12-CV-57048, 2013 WL 3814917 (9th Cir. July 24, 2013) ("*Dish Network*") .......6, 10, 11, 13

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
  915 F.Supp.2d 1138 (C.D. Cal. 2012) ...................................................................10

*Cartoon Network LP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008) ("*Cablevision*") ............................................... passim

## TABLE OF AUTHORITIES (continued)

*In re Application of Cellco P'ship*,
    663 F. Supp. 2d 363 (S.D.N.Y. 2009) ("*Cellco*") ............................................................10, 14

*L. Batlin & Son, Inc. v. Snyder*,
    536 F.2d 486 (2d Cir. 1976)..........................................................................................17

*London-Sire Records, Inc. v. Doe*,
    542 F. Supp. 2d 153, 165 (D. Mass. 2008)………………………………………………14, 15

*Matthew Bender & Co. v. West Pub. Co.*,
    158 F.3d 693 (2d Cir. 1998), cert. denied, 526 U.S. 1154 (1999) ...........................17

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*,
    312 F.3d 94, 99 (2d Cir. 2002)……………………………………………………………17

*Montclair v. Ramsdell*,
    107 U.S. 147 (1883)......................................................................................................9

*Perfect 10, Inc. v. Giganews, Inc.*,
    11-Civ-7098, 2013 WL 3610706 (C.D. Cal. July 10, 2013) ....................................15

*Recording Indus, Ass'n of Am. v. Diamond Multimedia Sys.*,
    180 F.3d 1072 (9th Cir. 1999) ...................................................................................16

*Religious Tech. Center v. Netcom On-Line Comm. Svcs., Inc.*,
    907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*")....................................................12

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012)........................................................................................17

*Sony Corp. of Am. v. Univ. Studios, Inc.*,
    464 U.S. 417 (1984) ("*Sony*")........................................................................... passim

*Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*,
    478 F. Supp. 2d 607 (S.D.N.Y. 2007)……………………………………….……………16

*U.S. v. Am. Soc'y of Composers, Authors & Publishers*,
    627 F.3d 64 (2d Cir. 2010)..........................................................................................10

*Warner Bros. Enter., Inc. v. WTV Sys., Inc.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ("*Zediva*") .................................................15

*WNET, Thirteen v. Aereo, Inc.*,
    712 F.3d 676 (2d Cir. 2013) ("*Aereo II*") ...................................................... passim

## <u>TABLE OF AUTHORITIES (continued)</u>

*Zappa v. Rykodisc, Inc.*,
   819 F. Supp. 2d 307 (S.D.N.Y. 2011)........................................................................15

**STATUTES**

17 U.S.C. § 101............................................................................................................6, 16

17 U.S.C. § 103.................................................................................................................16

17 U.S.C. §106(4)...............................................................................................................6

17 U.S.C. § 110 ................................................................................................................11

47 U.S.C. § 15..................................................................................................................20

47 U.S.C. §§ 151, 309(a) .................................................................................................20

47 U.S.C. § 307........................................................................................................1, 2, 18

**TREATISES**

Melville B. Nimmer & David Nimmer, 1-2 Nimmer on Copyright § 2.10 (Rel. May 2011)......17

William F. Patry, 3 Patry On Copyright § 8:23 (March 2013)........................................14

Consumers are entitled to access over-the-air broadcast television using an antenna.[1] And consumers have a longstanding right to make recordings of those over-the-air broadcasts for their personal use. *Sony Corp. of Am. v. Univ. Studios, Inc.*, 464 U.S. 417, 454-55 (1984) ("*Sony*"). Hearst argues that the consumer's use of remote individual antenna and DVR equipment (rather than in-home equipment) violates copyright law. The Copyright Act, however, does not corral consumer antenna use to 1950s-era technology. On the contrary, courts have twice determined, on a detailed factual record, that use of the Aereo technology does not give rise to copyright infringement.[2] Aereo simply offers consumers the option to use an individual remote antenna and DVR to access and record over-the-air broadcasts and play those recordings back to themselves on an Internet-connected device.[3]

---

[1] Plaintiff Hearst Stations, Inc. ("Hearst" or "Plaintiff") broadcasts programming over the air on station WCVB-TV pursuant to a license granted by Congress. *See* 47 U.S.C. § 307 (grant of license subject to public "interest, convenience, and necessity"). In return, Hearst is obligated to provide over-the-air broadcasts free of charge to the public. Hearst acknowledges that it is under such an obligation. First Am. Compl., ECF No. 32, ¶¶ 5-6.

[2] *Am. Broad. Cos. v. Aereo, Inc.*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012) ("*Aereo I*") and *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676 (2d Cir. 2013) ("*Aereo II*"). In addition, the Second Circuit, after extensive briefing by plaintiffs and multiple amici, declined *en banc* review. *Am. Broad. Cos. v. Aereo, Inc.*, Nos. 12-CV-2807, 12-CV-2786, 2013 WL 3657978 (2d Cir July 16, 2013) ("*Aereo III*").

[3] Hearst argues that it will lose retransmission fees from cable and satellite (paid on a per subscriber basis) if consumers use an Aereo antenna to access over-the-air broadcasts. But Hearst does not have an **entitlement** to retransmission revenue with respect to a consumer's use of an antenna to access broadcast television. Indeed, even if every consumer in America elected to use an antenna, rather than satellite or cable, to access over-the-air broadcasts (whether rabbit ears, a traditional rooftop antenna, or Aereo antenna), Hearst cannot claim to be "harmed" in any legal sense because that is the consumer's right. Further, Hearst is very well-compensated through advertising revenue for consumers' viewing of the over-the-air programming. Increased viewership means more revenue to Hearst. It is notable that Hearst posits as its "harm" and public interest arguments *its own threat* to take its programming off the air if Aereo wins. It says it will take its own programming off the air and, therefore, consumers will be harmed. This position—essentially, we will take our ball and go home if we do not prevail—is outrageous. If

As noted in Aereo's motions to transfer and stay this action, the claims filed by Hearst are essentially identical to those previously filed against Aereo in the Southern District of New York by all the major broadcasters.[4]   The national broadcasters (the "New York Plaintiffs") moved for a preliminary injunction and that motion was denied after very extensive fact and expert discovery and a two-day evidentiary hearing.  *Aereo I*.  The New York Plaintiffs appealed to the Second Circuit, which affirmed all aspects of the decision.  *Aereo II*.  The New York Plaintiffs sought rehearing *en banc*, and that request was denied on July 16, 2013.  *Aereo III*.

Hearst, which is based in New York and is an affiliate of ABC (one of the New York Plaintiffs), now brings these claims in Massachusetts.  Hearst hopes to get a different result or, perhaps, that Aereo will somehow collapse under the weight of defending multiple identical actions.  For the reasons stated in Aereo's motion to transfer, the Court should not revisit these identical circumstances again and this case should be transferred to New York.  However, if this Court considers the merits of Hearst's motion for a preliminary injunction, it is clear that Hearst is not likely to succeed on any of its claims:

---

Hearst is not using the valuable public spectrum it is allotted for free in the public interest it should forfeit the spectrum.  It is not entitled to prevent consumers from using an individual antenna to watch television.  *See* Pl. Mem. of Law in Supp. of Mot. for Prelim. Inj., ECF No. 5 (July 9, 2013) ("Pl. Mem.") at 19-20; Decl. of Bill Fine, ECF No. 5-2 (July 9, 2013) ("Fine Decl.") ¶¶ 36-37; *see also* 47 U.S.C. § 307 *et seq.* (describing the obligation of using spectrum in the public "interest, convenience, and necessity").

[4] The broadcasters filed two actions against Aereo on March 1, 2012: (i) *Am. Broad. Cos., Inc., et al. v. Aereo, Inc.*, 12-CV-1540 (AJN) (S.D.N.Y.) and (ii) *WNET, Thirteen, et al. v. Aereo, Inc.*, 12-CV-1543 (AJN) (S.D.N.Y.).  Despite the pending actions, in May 2013, CBS (the national broadcaster and a plaintiff in one of the pending actions) publicly threatened to sue Aereo in each market Aereo launched its technology.  Accordingly, Aereo filed a declaratory judgment action in the Southern District of New York against CBS and ten CBS licensing entities: *Aereo, Inc. v. CBS Broad. Inc.*, 13-CV-3013 (AJN) (S.D.N.Y.).  Despite CBS's clear threats of seriatim lawsuits, the defendants moved to dismiss the action and that motion is pending.

- <u>Public Performance</u>: Aereo's technology enables consumers to make unique, personal recordings of over-the-air broadcasts and to play those recordings back to themselves. Under settled law, that is not a *public* performance, but a lawful *private* performance.

- <u>Reproduction</u>: The only copies made using the Aereo technology are made by the consumer and not Aereo. Like a copy machine, Aereo's technology responds automatically to consumer commands. As such, under established law, Aereo cannot be liable for copying because Aereo has not engaged in a necessary volitional act.

- <u>Distribution</u>: The Aereo technology involves consumers streaming to themselves—as opposed to downloading—the consumer's unique, personal recordings. Under established law, streaming does not constitute "distribution" under the Copyright Act. In addition, any playback stream is initiated exclusively by the consumer, not Aereo.

- <u>Derivative Works</u>: In responding automatically to the consumer's commands using Aereo, digital information is transcoded from one format to another. Under established law, this does not create a derivative work because it adds no additional creative element. Indeed, the Sony Betamax in the *Sony* case automatically converted a signal from one form (radio frequency signal) to another (magnetic videotape).

Also, Hearst cannot show that it will be irreparably harmed if its requested preliminary injunction is denied. Hearst cannot claim harm from consumer use of individual antennas because consumers are entitled to use them. Further, Hearst has not alleged (much less demonstrated) any current harm[5] or concrete future harm. It alleges only the ***possibility*** of future harm. Such speculations cannot warrant the extraordinary remedy of a preliminary injunction. In contrast, the harm to Aereo if an injunction issued would be devastating and irreparable. Were Aereo to be enjoined, its ability to attract customers, investors, and employees, and to negotiate favorable vendor contracts would be compromised. Any harm to Hearst is speculative at best, while the irreparable harm to Aereo is certain. A preliminary injunction should not issue.

---

[5] Recently, the New York Plaintiffs have repeatedly admitted that Aereo does not cause them measurable, quantifiable harm. *See, e.g.*, Declaration of R. David Hosp, Ex. A at 12. Indeed, New York Plaintiff CBS recently reported quarterly profits jumped 11% and retransmission fees had increased. *Id.*, Ex. B. (Unless otherwise indicated, all Exhibits ("Ex.") cited herein are attached to the Declaration of R. David Hosp ("Hosp Decl.") submitted herewith.)

3

## FACTS

Concerning the operation of the Aereo technology, Hearst relies on statements made by Aereo in the action in the Southern District of New York.[6]  For the purpose of its motion for a preliminary injunction, Hearst accepts those facts as true.  Pl. Mem. at 5, n.5.  These facts, which are also reflected and further detailed in New York District Court's Opinion and Order regarding the operation of Aereo's technology,[7] demonstrate that Hearst is not entitled to an injunction.

Aereo created and provides innovative antenna and DVR technology that enables consumers to accomplish remotely what they could otherwise do at home.  Lipowski Decl., Ex. 1 ¶¶ 5, 7, 55; Horowitz Decl., Ex. 1 ¶¶ 54; 59; Kanojia Decl. ¶¶ 12, 33, 35.  At home, consumers can capture local over-the-air broadcast television via an antenna; make copies of that programming on a computer, VCR, or DVR; and view their recorded content via an Internet-connected device such as a television, smartphone, or tablet.  Lipowski Decl., Ex. 1 ¶¶ 7, 52, 55; Horowitz Decl. Ex. 1 ¶¶ 30, 31, 38, 71-79; Kanojia Decl. ¶ 10.  With Aereo, consumers can tune and use an individual remote antenna to a local broadcast television station; make an individual, unique copy of that programming using their remote DVR; and stream (not download) that

---

[6] Hearst relied on excerpts from Aereo declarations in *Am. Broad. Cos. v. Aereo, Inc.*, Nos. 12-CV-1540, 12-CV-1543 (AJN) (S.D.N.Y.) (consolidated).  Aereo files herewith the complete declarations from that case—the Declaration of Joseph Lipowski ("Lipowski Decl.) and the Declaration of Paul Horowitz ("Horowitz Decl.")—as well as an updated declaration from Aereo's CEO (the Declaration of Chaitanya Kanojia ("Kanojia Decl.")), which describes Aereo's activities since the preliminary injunction was denied.  The facts supporting this Opposition are set forth in these declarations.

[7] The Court in *Aereo I* made detailed findings of fact after very substantial fact and expert discovery and a two day evidentiary hearing.  The Second Circuit in *Aereo II* noted ". . . the lone factual dispute below was whether Aereo's antennas function independently or as one unit. The District Court resolved this dispute in favor of Aereo, finding that its antennas operate independently. . . .  Plaintiffs do not contest this finding on appeal."  *Aereo II* at 682, n6.

unique copy to themselves, on their personal Internet-connected device.  Lipowski Decl., Ex. 1 ¶¶ 5, 44, 46, 66; Horowitz Decl., Ex. 1 ¶¶ 55, 57, 63, 79; Kanojia Decl. ¶¶ 5, 28.

Using the Aereo technology, members can record programs and watch them while they are airing or at a later time.  Lipowski Decl., Ex. 1 ¶¶ 6, 7; Horowitz Decl., Ex. 1 ¶ 57; Kanojia Decl. ¶¶ 28, 29.  Every recording the consumer makes is a unique, separate, and individually identifiable copy of the underlying program associated with and accessible by only that one consumer who made it.  Lipowski Decl., Ex. 1 ¶¶ 5, 43, 56; Horowitz Decl., Ex. 1 ¶ 63; Kanojia Decl. ¶¶ 30, 32, 33.  Like an in-home DVR, the consumer makes a copy whether watching "live" or "recorded" content, which enables her to pause or rewind live television.  Lipowski Decl., Ex. 1 ¶¶ 7, 52-55 Horowitz Decl., Ex. 1 ¶ 56; Kanojia Decl. ¶¶ 32, 39-41.  Consumers can play back their own copies of the program to themselves at any time after the recording has begun. Lipowski Decl., Ex. 1 ¶¶ 6, 7, 52; Horowitz Decl., Ex. 1 ¶ 56; Kanojia Decl. ¶¶ 31-33.

Aereo members use individual remote antennas to access the over-the-air broadcasts they record.  Each antenna is connected to its own tuner and feed lines, and is tuned independently in response to the consumer's commands.  Lipowski Decl., Ex. 1 ¶¶ 35, 38; Horowitz Decl., Ex. 1 ¶¶ 56, 59; Kanojia Decl. ¶ 30.  From the moment a member tunes an Aereo antenna, the signal generated is available only to the member who activated and tuned the antenna.  Lipowski Decl., Ex. 1 ¶¶ 40, 41, 65; Horowitz Decl., Ex. 1 ¶¶ 56, 64; Kanojia Decl. ¶ 30.  The Aereo remote DVR functions automatically only in response to the consumer's instructions and actions; no consumer copies exist in the Aereo system unless the consumer has put them there.  Lipowski Decl., Ex. 1 ¶¶ 12, 14; Horowitz Decl., Ex. 1 ¶¶ 54 n. 40, 58; Kanojia Decl. ¶¶ 28, 30.

<u>**ARGUMENT**</u>

**I.    HEARST IS NOT LIKELY TO SUCCEED ON ITS COPYRIGHT
       INFRINGEMENT CLAIMS**

Hearst has alleged infringement of four rights: the public performance right, the

reproduction right, the distribution right, and the right to make derivative works.  Hearst cannot

succeed on any of these claims.[8]

> **A.    Aereo Does Not Infringe Any Public Performance Right Because Its
>         Technology Enables Private, Not Public Performances**

Public performance claims identical to those advanced by Hearst here have been fully

considered and rejected in *Aereo I* and *Aereo II*.  Both decisions analyzed the language of the

Copyright Act's Transmit Clause, 17 U.S.C. § 101, and applied the language to the Aereo

technology.  Both Courts concluded that the Act precludes a finding of infringement because a

transmission from an individual consumer's own individual copy solely by and to the consumer

who made that copy is a ***private*** performance.  Because the Act only prohibits ***public***

performances, there is no infringement.  Under the Copyright Act:

> [t]o perform or display a work 'publicly' means . . . *to transmit* or otherwise
> communicate *a performance* or display of the work . . . *to the public*, by means of
> any device or process, whether the members of the public capable of receiving the
> performance or display receive it in the same place or in separate places and at the
> same time or at different times.

17 U.S.C. §§ 106(4); 101 (emphasis added).

---

[8] The First Circuit has not had occasion to review the specific issues before this Court, but the
Second Circuit, in *Cablevision* and *Aereo II*, extensively examined these precise legal issues and
did so in reference to remote DVR technology (*Cablevision*) and the Aereo system itself (*Aereo
I, II,* and *III*) and concluded that there is no infringement.  Likewise, the Ninth Circuit has also
relied on *Cablevision* and its volition analysis in *Fox Broad. Co. v. Dish Network L.L.C.*, No. 12-
CV-57048, 2013 WL 3814917, at *4 (9th Cir. July 24, 2013) ("*Dish Network*").  *See D&H
Therapy Assocs., LLC v. Boston Mut. Life Ins. Co.*, 640 F.3d 27 (1st Cir. 2011) ("In the absence
of clear guidance from either this court or the Supreme Court, we look to the law of other
circuits.").

The Second Circuit provided an extensive analysis of the Transmit Clause in *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), which concerned a remote DVR like Aereo's. The Second Circuit explained that under the language of the Transmit Clause, the transmission of a copy of a program is a legally separate performance from the original transmission of the work:

> [The Transmit Clause] speaks of people capable of receiving a particular "transmission" or "performance," and not of the potential audience of a particular "work." Indeed, such an approach would render the "to the public" language surplusage. Doubtless the *potential* audience for every copyrighted audiovisual work is the general public. As a result, any transmission of the content of a copyrighted work would constitute a public performance under the district court's interpretation. <u>But the transmit clause obviously contemplates the existence of non-public transmissions; if it did not, Congress would have stopped drafting that clause after "performance."</u>

*Cablevision* at 135-136 (underlining added).

In defining what constitutes an infringement, Congress intended to make clear that both each performance must be analyzed separately from (and not aggregated with) the original performance of the underlying work and that only "public" performances were actionable as infringements—private performances were not:

> Although any act by which the initial performance or display is transmitted, repeated, or made to recur would itself be a 'performance' or 'display' under the bill, it would not be actionable as an infringement unless it were done 'publicly,' as defined in section 101.

H.R. REP. No. 94-1476, at 63 (1976), (available at http://www.copyright.gov/history/law/ clrev_94-1476.pdf).

In *Cablevision*, the Second Circuit articulated the following principles for determining whether a performance is "to the public": (1) each transmission must be separately examined; and (2) the transmit clause directs courts to "examine who precisely is 'capable of receiving' a

7

particular transmission of a performance." *Cablevision* at 135.  Based on the text of the Copyright Act, the Second Circuit concluded that the relevant performance was the discrete transmission by each remote DVR user of their unique copy of the television program to themselves, and held that where "the potential audience 'capable of receiving' that performance was limited to that user . . . each such performance was private, not public." *Aereo I* at 384 (citing *Cablevision* at 125, 135).

After extensive discovery, two days of live fact and expert witness testimony, and nearly 400 pages of proposed findings, the Southern District of New York found that Aereo's system was virtually identical to the *Cablevision* system in all respects material to the public performance analysis, and that there was no infringement of the public performance right because: (1) a unique copy of each program is created by each consumer who requests that program; (2) each transmission by a consumer using the Aereo system is from the consumer's unique copy; and (3) each transmission of the unique copy is made solely by and to the consumer who made the copy.  *Aereo I* at 386.[9]  The Second Circuit agreed: "[J]ust as in *Cablevision*, the potential audience of each Aereo transmission is the single user who requested that program be recorded."  *Aereo II* at 690.  The Second Circuit rejected attempts to distinguish *Cablevision*, finding that the plaintiffs' arguments were already either considered and rejected in *Cablevision* or were contrary to that Court's reasoning.  *Id*. at 690-91.  The New York Plaintiffs requested *en banc* review of the *Aereo II* decision; the Second Circuit in *Aereo III*, after polling each member of the Court, rejected their petition.

---

[9] The Court found that given the individual antennas, the Aereo technology was an even stronger case for a finding of private performances than the facts in *Cablevision*.  *See Aereo I* at 387.

Hearst asserts that "the statute is concerned with 'the performance of the copyrighted work . . . irrespective of which copy of the work the transmission is made from.'"  Pl. Mem. at 10.  Hearst's argument ignores the statutory text and improperly conflates the broadcast of the underlying work with each subsequent performance of that work.[10]  The argument Hearst advances is contrary to the text of the Copyright Act and was carefully considered and rejected in *Cablevision*, *Aereo I*, and *Aereo II*.[11]  In Hearst's view of the statute, the words "a performance or display of" are surplussage, written out of the Transmit Clause of the Copyright Act.  This is contrary to basic rules of statutory construction and would essentially mean that no performance would ever be private.  *See, e.g.*, *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute . . . .").[12]

---

[10] Acceptance of Hearst's argument would also have a devastating impact on other industries. As made clear in the *amicus* brief submitted in the case in the Second Circuit by the Computer & Communications Industry Association and the Internet Association, the entire cloud computing industry relies on *Cablevision*'s public performance analysis of the Copyright Act in creating and deploying its technology.  Hosp Decl., Ex. C.

[11] The Second Circuit in *Cablevision* recognized the absurd results that could arise if the public performance analysis looked to the performance of the "work" and not to the individual "transmission":

> Assume that HBO transmits a copyrighted work to both Cablevision and Comcast. Cablevision merely retransmits the work from one Cablevision facility to another, while Comcast retransmits the program to its subscribers. Under plaintiffs' interpretation, Cablevision would still be transmitting the performance to the public, solely because Comcast has transmitted the same underlying performance to the public. Similarly, a hapless customer who records a program in his den and later transmits the recording to a television in his bedroom would be liable for publicly performing the work simply because some other party had once transmitted the same underlying performance to the public.  (*Cablevision* at 136.).

[12] Hearst is making exactly the same conflation or aggregation argument (examining the underlying work rather than the specific performance at issue) when it focuses on the language in the Transmit Clause that a *performance* is public "whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or different times."  Pl. Mem. at 7-8.  The application of the language is entirely based on

Remarkably, Hearst does not even address *Cablevision* or the Second Circuit's *Aereo II*

decision. Instead, it relies on an interpretation of the Transmit Clause in the **dissenting opinion**

in *Aereo II*, which was rejected once by the Southern District of New York and twice by the

Second Circuit.[13] Hearst cites to no First Circuit cases interpreting the Transmit Clause, and

ignores numerous other cases holding that each transmission is a separate performance under the

Transmit Clause. *See U.S. v. Am. Soc'y of Composers, Authors & Publishers*, 627 F.3d 64, 74-

75 (2d Cir. 2010) (applying *Cablevision*); *In re Application of Cellco P'ship*, 663 F. Supp. 2d

363, 371-74 (S.D.N.Y. 2009) ("*Cellco*") (same).[14] Finally, Hearst's references to 17 U.S.C.

---

what performance is being analyzed. Using the Aereo technology (or the Cablevision technology), the relevant performance is the lone transmission of the individual copy by the consumer to themselves. As the Second Circuit noted in Cablevision: "[t]his plain language instructs us that, in determining whether a transmission is 'to the public,' it is of no moment that the potential recipients of the transmission are in different places, or that they may receive the transmission at different times. The implication from this same language, however, is that it is relevant, in determining whether a transmission is made to the public, to discern who is 'capable of receiving' the performance being transmitted." *Cablevision* at 134 (emphasis added).

[13] Hearst also relies on the district court case in *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F.Supp.2d 1138 (C.D. Cal. 2012), which concerns a technology that the defendant argued was like Aereo's and the plaintiff broadcasters argued was not. In that case (now on appeal to the Ninth Circuit), the district court declined to follow *Cablevision*, positing that the Ninth Circuit was unlikely to follow the Second Circuit's analysis. On July 24, 2013, after the *BarryDriller* appeal was briefed, the Ninth Circuit expressly followed *Cablevision* in holding that an ad-skipping DVR offered by Dish Network likely does not infringe Fox's copyrights. *Dish Network* at *4. The Ninth Circuit has given no indication that its agreement with the *Cablevision* decision does not also apply to the public performance analysis.

[14] Hearst's reliance on the 1976 Copyright Act's abrogation of the Supreme Court's decision in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968) also is unavailing. First, the performances in this case came from a single common source—one community antenna—not individual remote consumer antennas, which are the foundation of the Aereo technology. In that decision, the Supreme Court found (under the 1909 Copyright Act, not the governing 1976 version of the Act) that a cable retransmission from a single source was not a "performance." The question of what constituted a "public" performance was not addressed because it was not relevant to the prior Act's framework.

§ 110(5) are inapposite.  Section 110(5) deals with the "***communication*** of a transmission," and

thus addresses situations where radios or televisions are ***played*** in public places.  Section

110(5)(A) allows people, for example, to ***listen*** to a boom-box or a transistor radio outside in a

park or at the beach.[15]  The section has nothing to do with whether or not a transmission is "to

the public."

> **B.      Aereo Does Not Infringe Any Reproduction Right Because The Consumer Makes The Copy**

Hearst argues that Aereo infringes its reproduction right because, it asserts, Aereo

"copies" the programming.  Pl. Mem. at 13.  Hearst is wrong because Aereo is not the actor.  The

Aereo technology—just like the technology in *Cablevision*—responds directly and automatically

to consumer commands.  Lipowski Decl., Ex. 1 ¶¶ 12, 14; Horowitz Decl., Ex. 1 ¶ ¶ 54 n. 40, 58;

Kanojia Decl. ¶¶ 28, 30.  Just as in *Cablevision*, Aereo's members provide the volitional conduct

that creates the copy of the program they select.[16]  *Id*.  Absent the specific action of the consumer

in each instance, no recording occurs.[17]  *Id*.

---

[15] But for Section 110(5)(A), such activity could be deemed a "public performance" because other members of the public would be able to hear the same musical performance, and a license would be required.  The reference to the reception of the transmission being made "on a single receiving apparatus of the kind commonly used in public homes" merely makes clear that if a person uses multiple boom-boxes or erects giant speakers in the park so many people can hear the performance, it will still be deemed a performance "to the public" and the limitation on liability is not available.  H.R. REP. No. 94-1476, at 86 (1976).

[16] When a member records a program, the member makes three copies in three different bit rates so that playback can be successful on the different types of consumer playback devices.  Hosp Decl., Ex. D.  *See also* Lipowski Decl., Ex. 1, Exhibit 3; Kanojia Decl. ¶ 40.

[17] Aereo does not address any claim for indirect infringement because Hearst has not asserted it. Nonetheless, any such claim would be foreclosed by *Sony,* which held that consumers are entitled to make copies of over-the-air programs for their personal use.  *Sony* at 455-56.  *See also Dish Network* at *5 (citing *Sony* as "strong guidance" in finding that Dish met its burden to establish that all four fair use factors favor a finding that a consumer's recording of programming

The Second Circuit in *Cablevision* relied on a long line of well-established case law, beginning with *Religious Tech. Center v. Netcom On-Line Comm. Svcs., Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*") in finding that Cablevision was not liable for direct infringement with respect to the copies created in its remote DVR system because the system functioned automatically in response to consumer commands.  The Court found that the necessary volition was supplied by the consumer.  *Cablevision* at 131-33 ("Copies produced by the RS-DVR system are 'made' by the RS-DVR customer, and Cablevision's contribution to this reproduction by providing the system does not warrant the imposition of direct liability.").

In *Netcom*, the court found that an Internet Service Provider ("ISP") was not liable for copyright infringement where its computer system enabled third parties to post infringing material to its website, which resulted in automatic copying of the material onto the ISP's and others' computers.  The *Netcom* court noted that the ISP "did not take any *affirmative action* that directly resulted in copying plaintiffs' works…"  *Netcom* at 1370 (emphasis added).  The Fourth Circuit followed *Netcom* in *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550-51 (4th Cir. 2004), explaining that "a person had to engage in volitional conduct—specifically, the act constituting infringement—to become a direct infringer," and held that "to establish direct liability [for copyright infringement] . . . something more must be shown than mere ownership of a machine used by others to make illegal copies."

Relying on this line of cases, the Second Circuit found that Cablevision was not liable for infringing the asserted reproduction right through providing its remote DVR system because it

---

broadcast over the air constitutes a fair use under 17 U.S.C. § 107).  To find Aereo liable as an indirect infringer, the Court would need to find that consumers are direct infringers when they use a remote antenna and DVR to watch over-the-air broadcasts.

was the consumer, not Cablevision, who "made" the copies.  *Cablevision* at 133.  The Court

recognized that "volitional conduct is an important element of direct liability," and explained that

in the case of a system that responded automatically to consumer commands, it was the

consumer, not the technology provider, who supplied the necessary volitional conduct:

> There are only two instances of volitional conduct in this case: Cablevision's
> conduct in designing, housing, and maintaining a system that exists only to
> produce a copy, and a customer's conduct in ordering that system to produce a
> copy of a specific program.  In the case of a VCR, it seems clear—and we know
> of no case holding otherwise—that the operator of the VCR, the person who
> actually presses the button to make the recording, supplies the necessary element
> of volition, not the person who manufactures, maintains, or, if distinct from the
> operator, owns the machine.  We do not believe that an RS-DVR customer is
> sufficiently distinguishable from a VCR user to impose liability as a direct
> infringer on a different party for copies that are made automatically upon that
> customer's command.  (*Id*. at 131).

The Ninth Circuit recently relied on *Cablevision* to affirm the denial of a preliminary

injunction on volition grounds.  *Dish Network* at *5, *10.  At issue is technology that enables

consumers to record an entire primetime broadcast line-up with a single button.  Notwithstanding

that the consumer might not know which programs were being recorded or want to watch all of

those programs, the Ninth Circuit found that the consumer supplied the necessary volition

because the copies were made by the consumer.  *Id*. at *4, *5 (finding that the consumer, not

Dish, "is 'the most significant and important cause' of the copy" in circumstances where Dish's

involvement in the copies being made exceeds the involvement in *Cablevision* and *Aereo*).

These cases stand for the well-established principle that a technology provider cannot be

held directly liable on a copyright claim for providing a machine that responds automatically to

user commands.  As in *Cablevision*, Aereo only provides technology that consumers use to make

copies.  Because each recording is made by the consumer, and the Aereo system functions

13

automatically in response to the consumer's commands, Aereo cannot be held liable for direct

infringement of the reproduction right.  Hearst will not prevail on its reproduction claim.

C.    **The Aereo Technology Platform Does Not Involve Any "Distribution"**

When consumers play back their individual recordings, Aereo is not "distributing"

Hearst's works.  First, it is undisputed that the playback by the consumer results in a ***stream*** of

the recording, not a ***download***.  Lipowski Decl., Ex. 1 ¶¶ 44, 46; Horowitz Decl., Ex. 1, ¶¶ 57,

63.  A stream is not a "distribution" under the Act.  Second, it is consumers—not Aereo—who

engage in the volitional act of playing back their personal recordings.  As such, even if there

were a "distribution" (there is not), the consumer engages in the alleged infringing act, and

Aereo is not directly liable for it.

It is established that a stream is a type of "performance" and a "download" is a type of

"distribution."  *See generally* William F. Patry, 3 Patry On Copyright § 8:23 (March 2013) ("The

distinction between a performance and a distribution should be drawn by reference to the type of

transmission involved:  if the transmission delivers a copy of a work to a consumer in non-real

time, it is a distribution.  If streaming or other real-time conduct is involved, it is a

performance.").  When streaming, a consumer can perceive the work roughly contemporaneous

with its transmission (i.e., the work is "performed"), but the consumer is not left with a copy for

later use (i.e., the work is not "distributed").  In contrast, a download is not perceptible until

delivery of the digital file is complete, so there is no performance, but there is a distribution.

*See*, *e.g.*, *Cellco* at 373-74 (finding a download to be a distribution and contrasting streaming).

Although not cited by Hearst, this Court has recognized this important distinction.  In

*London-Sire Records, Inc. v. Doe*, Judge Gertner addressed whether a distribution required the

delivery of a physical item—in other words, the delivery of a physical CD versus the download

14

of a digital file.  542 F. Supp. 2d 153, 165 (D. Mass. 2008).  She articulated a test for

determining whether a "digital distribution" occurs: "What matters in the marketplace is not

whether a material object [i.e., a CD] 'changes hands,' but whether, ***when the transaction is***

***completed, the distributee has a material object.***"  *Id*. at 174.  When a download occurs, the

consumer has a material object—the new copy located on the consumer's device.  In contrast,

when a stream occurs, the consumer is left with no material object—the consumer can only

perceive the performance contemporaneously.  Thus, where the transmission is a stream, there is

no violation of the "distribution" right under the Act.[18]  Furthermore, even if there were a

distribution, Aereo cannot be directly liable because it does not engage in the "volitional act" that

is a necessary element of a distribution claim.[19]  Hearst will not succeed on its distribution claim.

---

[18] Hearst's cases from other jurisdictions do not provide otherwise.  In *Capital Records, LLC v. Bluebeat, Inc.,* 765 F. Supp. 2d 1198 (C.D. Cal. 2010), the defendant permitted both downloads and streams and the court found the defendant liable for violations of public performance and distribution rights without discussing which claims corresponded to which right.  In stark contrast to Judge Gertner's opinion in *London-Sire*, the *Capital Records* case provides no analysis of the distribution right and streaming.  Similarly, Hearst's citation to *Warner Bros. Enter., Inc. v. WTV Sys., Inc.* ("*Zediva*"), 824 F. Supp. 2d 1003 (C.D. Cal. 2011) is inapposite. *Zediva* is a public performance case; there is no discussion, analysis, or holding concerning streaming and the distribution right.  In addition, Hearst's parenthetical mistakenly references not what Zediva was alleged to do, but how the plaintiff copyright holder described its own business.

[19] *See*, *e.g.*, *Perfect 10, Inc. v. Giganews, Inc.*, No. 11-Civ-7098, 2013 WL 3610706, at *3 (C.D. Cal. July 10, 2013) (granting motion to dismiss on distribution claim where defendant "has not engaged in the volitional conduct by which it 'causes' the distribution"); *Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307, 315-16 (S.D.N.Y. 2011) (granting summary judgment for lack of "volitional conduct" that "caused" the alleged distribution to be made); *Disney Enter., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1309-10 (S.D. Fla. 2011) (finding that a volitional act is necessary for distribution claim and granting motion to dismiss); *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006) (Finding no distribution liability where "without the user's request, the copy would not be created and sent to the user, and the alleged infringement at issue in this case would not occur.  The automated, non-volitional conduct by Google in response to a user's request does not constitute direct infringement under the Copyright Act").

**D.      The Aereo Technology Platform Does Not Involve the Creation of Any "Derivative Works"**

During operation, when responding to consumer commands, the Aereo technology automatically transcodes or "reformats" electronic information from one digital format to another.  Lipowski Decl., Ex. 1 ¶¶ 13, 41; Horowitz Decl., Ex. 1 ¶ 62.  This process—which is common in many electronic devices, such as televisions, iPads, and computers—does not create a derivative work.  Hearst cites no cases for the proposition that reformatting creates a derivative work, and numerous cases illustrate the opposite.  For example, the Supreme Court found Sony not liable for selling a Betamax recorder even though such a recorder reformatted the over-the-air broadcast television signal into the "Beta" format magnetic tape.  *See generally Sony*. Similarly, the Ninth Circuit held it is lawful to convert music from a compact disc into the MP3 format, and then copy the MP3 "files" onto a handheld player to make them portable.  *Recording Indus., Ass'n of Am. v. Diamond Multimedia Sys.*, 180 F.3d 1072, 1079 (9th Cir. 1999).[20]

To be a derivative work under the Act, ***new, original creative work must be added*** to the pre-existing material.  *See* 17 U.S.C. §§ 101, 103(b) (extending copyright protection in a derivative work only to newly-added original material).[21]  Mere changes to format do not supply

---

[20] Neither the district court nor the Second Circuit attributed any legal significance to the automatic reformatting of cable television signals for buffering and storage on the Cablevision RS-DVR.  *Cablevision* at 127; *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.,* 478 F. Supp. 2d 607 (S.D.N.Y. 2007).

[21] This principle also is applied by the Copyright Office to applications to register derivative works: "To be copyrightable, a derivative work must differ sufficiently from the original to be regarded as a new work or must contain a substantial amount of new material.  Making minor changes or additions of little substance to a preexisting work will not qualify a work as a new version for copyright purposes." Copyright Office Circular 14, "Copyright Registration for Derivative Works," at 1 (August 2011) (available at http://www.copyright.gov/circs/circ14.pdf).

the originality or authorship required by law to qualify as a derivative work.[22]  *See L. Batlin &*

*Son, Inc. v. Snyder*, 536 F.2d 486, 491 (2d Cir. 1976); *Bridgeman Art Library v. Corel Corp.*, 36

F. Supp. 2d 191, 199 (S.D.N.Y. 1999) ("[A] change of medium alone is not sufficient to render

the product original and copyrightable.); *see also Matthew Bender & Co. v. West Pub. Co.*, 158

F.3d 693 (2d Cir. 1998), cert. denied, 526 U.S. 1154 (1999) (automated pagination of legal

opinions contains no original or creative expression and obtains no copyright protection).[23]  Any

digital reformatting automatically made by the Aereo technology has no independent

significance under copyright law.  Reformatting is a technological necessity integral to, but

otherwise incidental to, the consumer's lawful DVR recording of a transmission from an antenna

and cannot give rise to liability.  Hearst is not likely to prevail on its derivative work claim.

## II.    HEARST HAS NOT DEMONSTRATED IRREPARABLE HARM

Consumers are entitled to access over-the-air programming via an individual antenna; in

the 1984 *Sony* case, the Supreme Court held that consumers could record broadcast television for

personal use.  As a result, Hearst's purported harm from consumer use of an antenna and DVR,

---

[22] The Copyright Office denies copyright registration based on mere formatting alterations.  For example, "[m]echanical changes or processes applied to a sound recording, such as a change in format, declicking, and noise reduction, generally do not represent enough original authorship to be registered."  Copyright Office Circular 56, "Copyright for Sound Recordings," at 4 (March 2011).  *See* Melville B. Nimmer & David Nimmer, 1-2 Nimmer on Copyright § 2.10[A][1] at 2-176 n.15 (May 2011) ("[The Circular] indicates that such required originality will not be found merely by reissuing 'the same recording on tape that had previously been published as a disc,' or 'if the only change is to "rechannel" mechanically the same series of sounds… .'").

[23] Hearst cites *Cambridge Literary Props. v. W. Goeble Porzellanfabrik G.m.b.H.*, 510 F. 3d 77, 90 (1st Cir. 2007) to support its claim.  *Cambridge Literary*, however, dealt with a translation of a book from German to English.  Language translations may involve creative elements since it is generally not a word-for-word process, but depends on the creative interpretation of idiom usage and other complex language conventions.  *Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 53 (1st Cir. 2012) ("the art of translation involves choices among many possible means of expressing ideas").  *Cambridge Literary* has nothing to do with formatting changes, as here.

whether in-home or remote is not legally cognizable.  In fact, trying to interfere with a

consumer's right to use an antenna is contrary to Hearst's obligation to use the public airwaves in

the public "interest, convenience, and necessity."  47 U.S.C. § 307 *et seq*.  Hearst cannot claim to

be harmed when consumers use over-the-air antennas (as permitted) to access and copy

programs they have been "invited to witness in [their] entirety free of charge."  *Sony* at 449.

Even if Hearst could posit a legally cognizable theory of harm, it has not demonstrated

that it has actually been harmed, or even that it is likely to be harmed; rather, it speculates about

ways it could be harmed.  For example, it argues that Aereo could harm its ability to provide

online streaming of its programming.  But it does not provide its allegedly copyrighted material

over the Internet or have concrete plans to do so.  Fine Decl. ¶ 22.  Likewise, Hearst provides no

evidence that retransmission license fees are or will be affected.  In any event, Hearst has no

entitlement to retransmission fees with respect to consumer use of antennas, remote or otherwise.

Finally, Hearst asserts that Aereo's technology could undermine WCVB's ability to

generate advertising revenue because it "could result in a material undercounting of WCVB's

viewership, which is difficult, if not impossible, to quantify."  Pl. Mem. at 19.  As Hearst is

aware, organizations that measure television viewership, such as Nielsen, the Coalition for

Innovative Media Management ("CIMM"), and ComScore, are implementing new methods and

industry standards for tracking viewership across all platforms.  Hosp Decl., Ex. E (Nielsen has

"pledged to measure TV viewership on iPads and other mobile devices in the future" because of

technology like Aereo.).  Aereo has made clear that it does not object to the measurement of

viewership using its technology.  Kanojia Decl. ¶ 38.  Because Aereo will likely increase overall

television viewership, Hearst will receive greater compensation through advertising revenues.

Hearst's assertions of harm are either unfounded or speculative in every case; such unsubstantiated, theoretical harm cannot justify a preliminary injunction. *See Charlesbank Equity Fund II v. Blinds To Go*, 370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

## III.   THE BALANCE OF EQUITIES FAVORS AEREO

While Hearst cannot demonstrate imminent irreparable harm, Aereo would suffer devastating harm if an injunction were allowed.  That harm is detailed in the declaration of Aereo's founder and CEO, Chaitanya Kanojia. *First*, Aereo would lose existing and future customers if its technology is perceived as unlawful, or access to the technology is limited. Kanojia Decl. ¶¶ 60-62. *Second*, an injunction could put at risk Aereo's substantial existing commercial obligations, such as vendor contracts and leases in Boston and other markets and it will be difficult to negotiate new contracts at all, let alone on favorable terms. *Id*. ¶¶ 53, 55, 58-59, 63, 64. *Third*, Aereo is an innovative technology company attracting and employing talented engineers and others, including fifty current employees in Boston, and more to join soon.  These jobs will be at risk if an injunction issues.  The loss of talent would pose a potentially insurmountable obstacle to Aereo's ability to recover from a preliminary injunction. *Id*. ¶¶ 50-52, 58, 59, 65, 67. *Fourth*, an injunction could affect Aereo's ability to raise additional capital, which is critical to support its existing obligations and future growth. *Id*. ¶ 66. *Finally*, Aereo has established extraordinary fame and goodwill associated with its brand, built on the quality of its technology and repeated successes.  This goodwill is an extraordinarily valuable asset and will be irreparably damaged by an injunction. *Id*. ¶¶ 56-60, 67-69.  It is notable that two courts

have examined this matter in three proceedings and decided that an injunction is not warranted; it

would undo those Courts' work to issue an injunction that could strike a fatal blow to Aereo.

## IV.    AN INJUNCTION IS NOT IN THE PUBLIC INTEREST

Congress has expressed a clear public policy "to make [the broadcast airwaves] available,

so far as possible, to all the people of the United States."  47 U.S.C. § 151; *see also Sony* at 454

(there is a "public interest in making television broadcasting more available").  Aereo furthers

the policies enumerated by Congress by providing a lawful and innovative option for consumers

to access over-the-air broadcasting.  Hearst's attempt to block Aereo's lawful behavior—and

Aereo's users' lawful access—is antithetical to the congressional intent and decidedly against the

public interest, consumer convenience and options, and access to broadcast network television.

*See* 47 U.S.C. §§ 151, 309(a).  Hearst has not and cannot establish that it is in the public interest

to enjoin Aereo's operations.  Hearst alleges that "Boston area residents have a strong interest in

continuing to receive WCVB's unique, local programming."  Pl. Mem. at 19.  But it does not

show that Aereo's operation impacts WCVB's programming.  Instead, Hearst argues that the

public will be harmed because Hearst may elect to stop broadcasting if it loses.  If Hearst does

that, it will be Hearst, and not Aereo, that harms the public interest.

## CONCLUSION

For the foregoing reasons, Aereo requests that the Court **DENY** Hearst's motion for a

preliminary injunction.

Dated: August 7, 2013

*/s/  Frank E. Scherkenbach*
FISH & RICHARDSON P.C.
Frank E. Scherkenbach (BBO # 653,819)
Christopher Dillon (BBO # 640,896)
R. David Hosp (BBO # 634,091)
Mark S. Puzella (BBO # 644,850)
Sheryl Koval Garko (BBO # 657,735)
Matthew C. Berntsen (BBO #678,533)
One Marina Park Drive
Boston, MA 02210
Telephone: (617) 542-5070
Facsimile:  (617) 542-8906
Email:      scherkenbach@fr.com
            dillon@fr.com
            hosp@fr.com
            puzella@fr.com
            garko@fr.com
            berntsen@fr.com

Tal Kedem (*pro hac vice pending*)
Elizabeth E. Brenckman (admitted *pro hac vice*)
601 Lexington Avenue, Floor 52
New York, NY 10022
Telephone:   (617) 542-5070
Facsimile:   (617) 542-8906
Email:       kedem@fr.com
             brenckman@fr.com

*Attorneys for Defendant Aereo, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the NEF (NEF) and paper copies will

be sent to those indicated as non-registered participants on August 7, 2013.

*/s/  Frank E. Scherkenbach*
Frank E. Scherkenbach

21